1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    NORTHERN DISTRICT OF CALIFORNIA

8

9   FABRIENNE ENGLISH,                       Case No. 14-cv-01619-WHO

            Plaintiff,
10                                           **ORDER DENYING MOTION FOR**
                                             **CLASS CERTIFICATION**
11          v.
                                             Re: Dkt. Nos. 181, 208, 211, 213-14, 217,
12  APPLE INC, et al.,                       220

            Defendants.
13

14                              **INTRODUCTION**

15          Named plaintiff Fabrienne English accuses defendants Apple Inc., AppleCare Service

16  Company Inc., and Apple CSC Inc. (collectively, "Apple") of various misrepresentations and

17  omissions in connection with AppleCare+ ("AC+") and AppleCare Protection Plan ("APP"),

18  extended service plans Apple offers to purchasers of iPhones.  English's claims vary slightly, but

19  her core complaint is that Apple misrepresents to consumers that replacement iPhones under AC+

20  and APP will be new, when in fact many of the replacement devices in Apple's service stock are

21  "refurbished" or otherwise not new.  She moves to certify a class and two subclasses of purchasers

22  of AC+ and APP asserting claims under California law for violations of the Consumer Legal

23  Remedies Act ("CLRA"), the False Advertising Law ("FAL"), the Unfair Competition Law

24  ("UCL"), and the Secondhand Merchandize Labeling Law, Cal. Bus. & Prof. Code § 17531, and

25  for fraud.  None of her theories of liability support class certification, and she has not established

26  adequacy of counsel under Federal Rule of Civil Procedure 23(a)(4).  Her motion is DENIED.

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

# BACKGROUND

## I.    FACTUAL BACKGROUND

### A.    AC+ and APP

AC+ is a service plan offered by Apple for, among other products, the iPhone.  APP is a predecessor to AC+.[1]

Apple offered APP until October 2011.  Healy Decl. ¶ 3 (Dkt. No. 209-32).  APP cost $99 and provided consumers with hardware repair coverage and telephone technical support for two years from the date of purchase of the iPhone.[2]  *Id.*

Apple launched AC+ in October 2011.  *Id.* ¶ 4.  For $99, purchasers receive coverage for two accidental damage incidents.  *Id.*  The service fee for each incident was initially $49.  *Id.*  On September 10, 2013, the service fee was increased to $79.  *Id.* ¶ 5.  There is no service fee under AC+ for repairs not resulting from accidental damage.  *Id.* ¶ 6.

From when AC+ was first launched in October 2011 until September 2013, Apple allowed customers to purchase AC+ at the time of accidental damage.  *Id.* ¶ 8.  Thus, during that time period, if a customer's iPhone suffered accidental damage, rather than having to pay $149 for an out-of-warranty service event or approximately $449 for a new iPhone, the customer could purchase AC+ for $99 and receive a $50 discount on the $149 out-of-warranty service event, plus the two accidental damage incidents provided under AC+.  *Id.*  As discussed in more detail below, English purchased her AC+ plan in this way.

A customer who brings in her iPhone for service under AC+ or APP may have the iPhone repaired or replaced, depending on the circumstances (e.g., whether a repair is feasible) and the customer's preference.  When a customer decides to replace her iPhone, she receives a replacement device out of Apple's "service stock."  Apple describes its service stock as consisting

---

[1] In her TAC and briefing, English describes AC+ and ACC as "essentially extended warranties," TAC ¶ 11, and generally refers to them as "extended warranties," not service plans.  *See, e.g.,* Mot. at 1 (Dkt. No. 186-1); Reply at 2 (Dkt. No. 211-3).  I use "service plans" instead of "extended warranties" in this Order unless quoting from materials submitted by English.

[2] Every new iPhone comes with a one year limited warranty and 90 days of telephone technical support.  *See* Patel Decl. Ex. R (Dkt. No. 209-19).

United States District Court
Northern District of California

1    of three types of iPhones: (1) new iPhones; (2) remanufactured iPhones; and (3) reclaimed

2    iPhones.  *See* Opp. at 7 (Dkt. No. 208-3); Lanigan Decl. ¶ 3 (Dkt. No. 208-17).

3           New iPhones are made of all new parts and are "exactly the same" as the iPhones Apple

4    sells in its stores.  Lanigan Decl. ¶ 4.  New iPhones ██████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████████████████

6    ███████████████████████████████████████████████████  *Id.*  As discussed

7    below in more detail, the evidence in this case shows that English received only new iPhones as

8    replacement devices, not remanufactured or reclaimed iPhones.

9           Remanufactured iPhones are manufactured using the same process as new iPhones, but

10   "could contain both new parts and recovered parts that have been extensively tested."  *Id.* ¶ 5.

11   Apple states that "each and every remanufactured iPhone is inspected and tested to ensure that it is

12   equivalent to a new iPhone in performance and reliability."  *Id.*

13          Reclaimed iPhones are iPhones that have either ██████████████████████████████████

14   ████████████████████████████████████████████████████████████████

15   ███████████████████████████████  *Id.* ¶ 6.  Apple states that "[t]hese (essentially new)

16   iPhones undergo a testing and screening process to ensure that they are equivalent to new in

17   performance and reliability."[3]  *Id.*

18          All iPhones in Apple's service stock are shipped and stored in plain, white, unbranded

19   boxes.  *See* Williams Depo. at 210-11 (Patel Decl. Ex. T, Dkt. No. 209-21).  Because all iPhones

20   in the service stock are shipped and stored in this manner, Apple store employees do not know

21   whether any particular replacement device is new, remanufactured, or reclaimed.  *Id.* at 152-53,

22   231-32.

23          The current AC+ terms and conditions state in relevant part:

24                 If during the plan term you submit a valid claim . . . , Apple will
                   either (a) repair the defect at no charge, using new parts or parts that
25                 are equivalent to new in performance and reliability, or (b) exchange
                   the [iPhone], with a replacement product that is new or equivalent to

26

---

27   [3] In her TAC and briefing, English refers to all replacement iPhones other than new replacement
     iPhones as "refurbished."  *See, e.g.,* TAC ¶ 11; Mot. at 1; Reply at 1.  For ease of reference, I do
28   the same in this Order unless otherwise indicated.

3

United States District Court
Northern District of California

> new in performance and reliability. All replacement products provided under this plan will at a minimum be functionally equivalent to the original product.

TAC Ex. B (Dkt. No. 139-2).

The AC+ and APP terms and conditions in effect until September 2013 similarly stated:

> If during the coverage period you submit a valid claim. . . , Apple will either (a) repair the defect at no charge, using new or refurbished parts that are equivalent to new in performance and reliability, or (b) exchange the [iPhone] with a replacement product that is new or equivalent to new in performance and reliability, and is at least functionally equivalent to the original product.

TAC Ex. C (Dkt. No. 139-3).

**B.     English's Purchase and Use of AC+**

In September 2012, English obtained an iPhone 4 from Sprint in connection with signing up for Sprint wireless telephone service. English Decl. ¶ 3 (Dkt. No. 180-43). She gave the iPhone to her minor son. *Id.*

On February 15, 2013, English and her son went to an Apple store in NorthPark Center, Texas because the screen on the iPhone had cracked. *Id.* ¶ 4. English states that in discussing AC+ with an Apple employee at the store, she was told that she "would have two 'incidents' available for occurrences such as a cracked screen or water damage, and that the replacement devices would be new." *Id.* ¶ 6. She paid $99 for AC+ and another $99 to receive what the Apple employee allegedly described as a new iPhone 4. *Id.* ¶ 4; *see also* TAC Ex. E (Dkt. No. 139-5).[4]

The replacement iPhone was presented to English in the plain, white, unbranded box in which Apple packages its replacement devices. The box did not include "any label or other writing indicating that the [iPhone] was refurbished, reconditioned, used, or contained parts that were refurbished, reconditioned, or used." TAC ¶ 40. English states that the Apple employee "took great care to unseal and open [the box] in front of [her]," and that "[w]hen he took the iPhone out of the packaging he did so in a way that made [her] think that the device was new."

---

[4] According to Apple's records, English's son, as opposed to English herself, is the person associated with the iPhone and AC+ plan English purchased on February 15, 2013. *See, e.g.,* Patel Decl. Exs. B-C (Dkt. Nos. 208-5, 208-7). Apple contends that this fact, and the evidence that English's son was the principal user of the iPhone, make English an atypical and inadequate class representative. *See* Opp. at 11-12. Because I find that English's motion for class certification fails on other grounds, I do not address this issue.

English Decl. ¶ 7.

English contends that the replacement iPhone she received on February 15, 2013 was not new and was in fact a "refurbished device." *Id.* ¶ 9. She states that "[h]ad [she] known that [the] iPhone was not new, [she] would not have made the purchase, and would have considered other options such as getting an upgraded phone from Sprint." *Id.* ¶ 5.

Apple contends that the replacement iPhone was new. *See* Lanigan Decl. ¶ 9. It submits a declaration from Michael Lanigan, Director of AppleCare Supplier Quality Engineering and Mail-In Operations, who ███████████████████████████████████████████████████ ████████████████████████████████████████████████ *Id.* ¶ 1. He states that based on his research and analysis of Apple's records, the iPhone English received on February 15, 2013 was a new device. *Id.* ¶ 9.

English alleges that she "immediately started experiencing problems" with the replacement iPhone. English Decl. ¶ 11. The device "would freeze, stop working, and close without warning." *Id.* On July 22, 2013, she and her son went to an Apple store in Plano, Texas after the device completely stopped working and would no longer turn on. *Id.* An Apple employee there told her that the device had water damage and that she could use one of the accidental damage incidents under her AC+ plan to get a replacement. *Id.* English paid the $49.00 AC+ service fee and received another replacement iPhone 4. *Id.*; *see also* Patel Decl. Ex. E (Dkt. No. 209-6). This replacement device was again presented in a plain, white, unbranded box. English Decl. ¶ 11. According to English, the second replacement device, like her first one, was "refurbished." *Id.* According to Apple, it was also new. Lanigan Decl. ¶ 10.[5] English states that within a week of receiving the second replacement device, it began suffering from "freezing issues" like those

_____

[5] English states that she "has not had the opportunity to cross-examine the factual basis for Apple's claim that [the replacement iPhones she received were] new." Reply at 13. In support of her claim that the replacement iPhones she received were not new, she points to testimony from Apple that a replacement iPhone is more likely to be new shortly after the particular generation of iPhone is launched, because at that point there is a more limited inventory of refurbished units or parts. *See id.* (citing Healy Depo. at 127-128 (Parker Decl. Ex. 7, Dkt. No. 213-7); Lanigan Depo. at 98-100 (Parker Decl. Ex. 10, Dkt. No. 213-11)). English states that the iPhone 4 was released in 2010, approximately three years before she received her replacements in February and July 2013. *See id.*

exhibited by the first one.  English Decl. ¶ 12.

Over the weekend of November 1, 2013, English met class counsel, Renee Kennedy, while shopping in Houston, Texas.  *See* English Depo. at 209-212 (Patel Decl. Ex. G, Dkt. No. 209-8).  The following Monday (November 4, 2013) English and two other named plaintiffs filed this lawsuit.  Dkt. No. 1.

On February 28, 2014, English went back to the Apple store in NorthPark Center, Texas because the screen on her second replacement iPhone had cracked.  English Decl. ¶ 13.  English alleges that she was told by an Apple employee there that she had already used up both incidents allowed under her AC+ plan, and that as a result she was not entitled to another replacement device.  TAC ¶ 38.  She states that the employee "cited [her] initial purchase from Apple in February 2013 and the July 2013 replacement as the incidents of accidental damage replacement that [she] was entitled to under [her AC+ plan]."  English Decl. ¶ 13.

### C.   Initiation of this Action and Class Counsel's Experience with AC+

As noted above, this action was filed on November 4, 2013 by three named plaintiffs: Patricia Sue Adkins, Jennifer Galindo, and English.  Dkt. No. 1.  At that time, both Adkins and Galindo either were working or had worked for class counsel.  *See* Dkt. No. 82.  Galindo was class counsel's paralegal.  *Id.*  Shortly before Adkins and Galindo purchased the service plans underlying their claims, class counsel gave them "monetary gifts to thank them for their excellent work."  *Id.*  Adkins and Galindo used these gifts to purchase AC+.  *Id.* at 2.  Both purchased AC+ on the same date, October 30, 2013, five days before filing this lawsuit.  Dkt. No. 1.  Following instructions from class counsel, Galindo brought two audio recorders with her to the Apple store on October 30, 2013 for the purpose of recording her interactions with the Apple employees there.  Galindo Depo. at 60 (Patel Decl. Ex. M, Dkt. No. 209-14) ("Q: And why did you record your transaction at the Apple store?  A: Because Ms. Kennedy requested that I just record my . . . whole transaction experience with Apple.").

According to Apple's records, between February 2013 and March 2015, class counsel purchased or otherwise obtained twelve different iPhones.  O'Neil Decl. ¶ 6 (Dkt. No. 208-21).  She purchased an AC+ plan for an iPhone 5 in March 2013 and received a replacement iPhone 5

on September 7, 2013.  *Id.* ¶¶ 7-8.  In September and October 2013 – the months immediately preceding Adkins and Galindo's AC+ purchases and the filing of this action – class counsel repeatedly contacted Apple regarding the camera in the replacement device she had received on September 7, 2013.  *Id.* ¶ 13.  She stated that she believed that the device was "inferior" and repeatedly asked to be provided with a new iPhone in an Apple-branded box.  *Id.*

## II.      PROCEDURAL BACKGROUND

English is the only named plaintiff remaining in this case.  With the filing of the second amended complaint on January 17, 2015, Adkins and Galindo dropped out, while a new named plaintiff, Karen Lowthert, joined in.  *See* Dkt. No. 116.  English and Lowthert filed the TAC on March 6, 2015, alleging four causes of action against Apple based on alleged misrepresentations and omissions in connection with AC+ and APP: (1) violations of the CLRA, TAC ¶¶ 73-94; (2) violations of the FAL, TAC ¶¶ 103-111; (3) violations of the unlawful, unfair, and fraudulent prongs of the UCL, TAC ¶¶ 121-127; (4) violations of the Secondhand Merchandise Labeling Law, Cal. Bus. & Prof. Code § 17531, TAC ¶¶ 112-120; and (5) fraud, TAC ¶¶ 95-102.  Shortly after the TAC was filed, on March 19, 2015, Lowthert dropped out of the case, leaving English as the only named plaintiff.  *See* Dkt. No. 144.

English filed the instant motion for class certification on July 1, 2015.  She seeks to represent a class defined as:

> All natural persons who reside in any of the fifty United States of America, including the District of Columbia ("Persons"), who, for purposes other than resale, purchased from November 1, 2009 to the present, AppleCare Protection Plan or AppleCare+ (an "Extended Warranty") for iPhone (any of the models sold from November 2009 to present), at an Apple Store retail location, through an online purchase from Defendants, or through a telephone call to the Apple Online Store and/or to the AppleCare Contact Center, for personal, family or household purposes.

Mot. at 13.

She also proposes two subclasses.  The first is defined as "[p]ersons who purchased a replacement iPhone pursuant to a claim under an Extended Warranty and received a refurbished, remanufactured, used, or secondhand replacement iPhone."  *Id.*  The second is defined as "[p]ersons who purchased an Extended Warranty and had their contemporaneous purchase of an

United States District Court
Northern District of California

iPhone treated by Apple, Inc. (and/or treated by AppleCare Service Company, Inc. or Apple CSC, Inc.) as a replacement pursuant to an incident, such that their Extended Warranty's coverage would have only one further replacement available for purchase under their Extended Warranty."  *Id.* at 14.

I heard argument from the parties on October 14, 2015.  Dkt. No. 222.[6]

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions.  "Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted).  The burden is on the party seeking certification to show, by a preponderance of the evidence, that the prerequisites have been met. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

Certification under Rule 23 is a two-step process.  The party seeking certification must first satisfy the four threshold requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy.  Specifically, Rule 23(a) requires a showing that

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

The party seeking certification must then establish that one of the three grounds for certification applies.  *See* Fed. R. Civ. P. 23(b).  English invokes Rule 23(b)(3) and Rule 23(b)(2).

Rule 23(b)(3) provides that a class action may be maintained where

---

[6] Apple's unopposed motion for leave to file a surreply, Dkt. No. 217, is GRANTED.  English's motion for leave to file a notice of errata, Dkt. No. 220-10, is also GRANTED.  Apple's objections to the evidence submitted in conjunction with English's reply brief, Dkt. No. 219, are OVERRULED.

United States District Court
Northern District of California

the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). A (b)(3) class is appropriate "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (internal quotation marks omitted). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (internal quotation marks omitted).

A class action may proceed under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 131 S. Ct. at 2557 (internal quotation marks omitted). Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.* (emphasis omitted). Nor "does [it] authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.*

In considering a motion for class certification, the substantive allegations of the complaint are accepted as true, but "the court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through a class action." *Hanni v. Am. Airlines, Inc.*, No. 08-cv-00732-CW, 2010 WL 289297, at *8 (N.D. Cal. Jan. 15, 2010); *see also Jordan v. Paul Fin.,*

United States District Court
Northern District of California

1    *LLC*, 285 F.R.D. 435, 447 (N.D. Cal. 2012) ("[Courts] need not blindly rely on conclusory

2    allegations which parrot Rule 23 requirements.").  Accordingly, "the court may consider

3    supplemental evidentiary submissions of the parties."  *Hanni*, 2010 WL 289297, at *8; *see also*

4    *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975).

5         "A court's class-certification analysis . . . may entail some overlap with the merits of the

6    plaintiff's underlying claim."  *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct.

7    1184, 1194 (2013) (internal quotation marks omitted).  However, "Rule 23 grants courts no license

8    to engage in free-ranging merits inquiries at the certification stage."  *Id.* at 1194-95.  "Merits

9    questions may be considered to the extent – but only to the extent – that they are relevant to

10   determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* at 1195.

**DISCUSSION**

12        English has not shown that class certification is appropriate here.  First, for a variety of

13   reasons, none of her theories of liability provides a viable basis for a certifiable class.  Second, she

14   has not established adequacy of counsel under Rule 23(a)(4).[7]

**I.    NONE OF ENGLISH'S THEORIES OF LIABILITY PROVIDES A VIABLE BASIS FOR A CERTIFIABLE CLASS**

16        English asserts five basic theories of liability against Apple on behalf of class members:

17        (1) that Apple misrepresented to class members who purchased AC+ at the time of

18   accidental damage and simultaneously purchased a replacement iPhone that the initial replacement

19   would not count as one of the two incidents available under their AC+ plan;

20        (2) that Apple packages refurbished replacement iPhones in plain, white, unbranded boxes

21   without any indicators that the iPhones are not new;

22        (3) that Apple orally misrepresents during sales interactions that replacement iPhones

23   under the service plans will be new;

24        (4) that Apple misrepresents in the terms and conditions for the service plans that

25   replacement iPhones will be "equivalent to new in performance and reliability" and "at least

---

[7] Because I deny the motion for class certification for the reasons stated in this Order, I do not address Apple's other arguments against certification.

United States District Court
Northern District of California

1    functionally equivalent to the original product;" and

2           (5) that Apple improperly omits that replacement iPhones under the service plans could be

3    refurbished iPhones.

4           For the following reasons, I agree with Apple that, on this record, none of these theories

5    provides a viable basis for a certifiable class.

6    **A.    First theory: Apple misrepresented to class members who purchased AC+ at the time of accidental damage and simultaneously purchased a replacement iPhone that the initial replacement would not count as one of the two accidental damage incidents available under their AC+ plan**

7

8           The second putative subclass is built on this theory.[8]  The theory, in turn, is founded on

9    English's claim that when she attempted to return her second replacement iPhone on February 28,

10   2014, she was told that she had used up both accidental damage incidents available under her AC+

11   plan – one when she initially purchased AC+ while simultaneously purchasing her first

12   replacement iPhone, and the other when returning that first replacement device and obtaining her

13   second.[9]  *See* Mot. at 10-11.  English contends that Apple systematically misrepresented to

14   consumers who purchased AC+ at the time of accidental damage in conjunction with a

15   replacement iPhone that the initial purchase would not count against the two incidents available

16   under the service plan, when in fact Apple "characterizes the initial purchase [as] one of the two

17   allowed incidents . . . in certain circumstances." *Id.* at 10.

18          Apple does not dispute that between October 2011 and September 2013, it represented to

19   consumers that the purchase of AC+ at the time of accidental damage along with a replacement

20   iPhone would not count as an incident under their service plan.  *See* Opp. at 13-14.  To the

21   contrary, Apple offers evidence indicating that this was its official policy at the time English

22

23   _____

24   [8] As stated above, the second putative subclass consists of persons who "purchased an Extended Warranty and had their contemporaneous purchase of an iPhone treated by Apple, Inc. (and/or treated by AppleCare Service Company, Inc. or Apple CSC, Inc.) as a replacement pursuant to an incident, such that their Extended Warranty's coverage would have only one further replacement available for purchase under their Extended Warranty." Mot. at 14.

25

26

27   [9] The parties dispute whether English was in fact told on February 28, 2014 that her purchase of her first replacement iPhone counted as an accidental damage incident under her AC+ plan. Because I find that this first theory of liability is uncertifiable for failure to establish numerosity, I do not address this dispute.

28

United States District Court
Northern District of California

purchased AC+, and that its "training materials were consistent and unambiguous on this point." *Id.* But Apple also offers evidence indicating that it followed through on this policy – i.e., that, in line with its representations to consumers, it did not count the initial purchase of a replacement iPhone at the time of accidental damage as an incident under AC+ – and that it allowed consumers an additional two incidents under their service plans. *See* Healy Decl. ¶ 14.

With the exception of her own experience, English cites no evidence to the contrary. She vaguely asserts that "the software process was automated which would show that this would have been a consistent practice." Reply at 15. But the documents she cites in support of this assertion merely indicate that when a consumer uses an accidental damage incident under AC+, the incident is recorded through software that enables an Apple employee to check a certain menu item, thereby recording the use of the incident. *See, e.g.,* Williams Depo. at 230-31 (Parker Decl. Ex. 15, Dkt. No. 213-19). The documents do not indicate that Apple ever systematically (or even occasionally) counted the initial purchase of a replacement iPhone as an AC+ accidental damage incident, in contravention of its representations to consumers.

Simply put, English has not shown by a preponderance of the evidence that anyone other than her is in the second putative subclass. Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Because English has not satisfied this requirement, the second putative subclass, and her first theory of liability, cannot be certified.

**B.      Second theory: Apple improperly packages refurbished replacement iPhones in plain, white, unbranded boxes without any indicators that the iPhones are not new**

This theory of liability provides the basis for English's claims under the Secondhand

United States District Court
Northern District of California

12

Merchandise Labeling Law.[10]  English also appears to rely on the theory as a basis for her CLRA, FAL, UCL, and fraud causes of action.  *See, e.g.*, Reply at 4-5.  She states that whether Apple's use of the plain, white, unbranded boxes "is a misrepresentation or . . . is not a misrepresentation . . . is a question to be decided at trial."  *Id.*

The theory fails because English is not a typical or adequate class representative to assert it.  Apple presents a declaration from its Director of AppleCare Supplier Quality Engineering and Mail-In Operations stating that, according to Apple's database of replacement iPhones, both of English's replacement devices were new iPhones, not refurbished ones.  *See* Lanigan Decl. ¶¶ 9-10.  English offers no meaningful evidence in response.  She points to deposition testimony from Apple indicating that a replacement iPhone is more likely to be new shortly after the particular generation of iPhone is launched, because at that point there is a more limited inventory of refurbished units or parts.  *See* Reply at 13 (citing Healy Depo. at 127-128; Lanigan Depo. at 98-100).  But evidence regarding the *theoretical likelihood* that English's replacement iPhones would be refurbished does little to counter evidence that the replacement devices she *actually received were in fact new*.  English also states in her reply brief that she "has not had the opportunity to cross-examine the factual basis for Apple's claim that [the replacement iPhones she received

---

[10] The Secondhand Merchandise Labeling Law provides in relevant part:

> It is unlawful for any person, firm, or corporation, in any newspaper, magazine, circular, form letter or any open publication, published, distributed, or circulated in this state, including over the internet, or on any billboard, card, label, or other advertising medium, or by means of any other advertising device, to advertise, call attention to or give publicity to the sale of any merchandise, which merchandise is secondhand or used merchandise, or which merchandise is defective in any manner, or which merchandise consists of articles or units or parts known as "seconds," or blemished merchandise, or which merchandise has been rejected by the manufacturer thereof as not first class, unless there is conspicuously displayed directly in connection with the name and description of that merchandise and each specified article, unit, or part thereof, a direct and unequivocal statement, phrase, or word which will clearly indicate that the merchandise or each article, unit, or part thereof so advertised is secondhand, used, defective, or consists of "seconds" or is blemished merchandise, or has been rejected by the manufacturer thereof, as the case may be.

Cal. Bus. & Prof. Code § 17531.

were] new."  Reply at 13.  At oral argument, however, English withdrew her request for further discovery on this issue and focused instead on a request to add an as-of-yet-unidentified additional named plaintiff who had received a refurbished replacement device.

Typicality under Rule 23(a)(3) requires that the named plaintiff's claims be "reasonably coextensive" with those of absent class members.  *Hanlon*, 150 F.3d at 1020.  "The test of typicality is whether other [class] members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon*, 976 F.2d at 508 (internal quotation marks omitted).  The Ninth Circuit has cautioned that certification may be "inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Id.* (internal quotation marks omitted).  "[C]ertification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."  *Id.* (internal quotation marks omitted).

Similarly, to establish adequacy under Rule 23(a)(4), a named plaintiff must show that she "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

The evidence that English received new iPhones renders her atypical and inadequate with respect to her second theory of liability, because it raises serious questions regarding her ability to establish standing to pursue claims based on that theory.[11]  English does not explain how she can establish standing with respect to a theory based on Apple's allegedly improper packaging of refurbished replacement iPhones if she received only new replacement iPhones.  The danger that

---

[11] Indeed, the evidence indicates that English is not even a member of the first putative subclass, which is limited to persons who "received a refurbished, remanufactured, used, or secondhand replacement iPhone" under AC+ or APP.  Mot. at 13.  "Because [she] is not a member of [that] subclas[s], [she] cannot prosecute claims on [its] behalf."  *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014).

United States District Court
Northern District of California

the issue of her individual standing will become the focus of this litigation and will ultimately prejudice the class makes English an atypical and inadequate class representative with respect to her second theory of liability. *See S. Ferry LP No. 2 v. Killinger*, 271 F.R.D. 653, 658-59 (W.D. Wash. 2011) (finding that the named plaintiff's "uncertain standing" rendered it an atypical class representative); *see also Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) ("If [the named plaintiff] has no . . . claim, she cannot represent others who may have such a claim, and her bid to serve as a class representative must fail."). Accordingly, on this record, the theory cannot be certified.

### C. Third theory: Apple employees orally misrepresent during sales interactions that all replacement iPhones under the service plans will be new[12]

This theory fails because English has not presented the sort of allegations and evidence necessary to certify a class based on alleged oral misrepresentations. In the fraud context, the Ninth Circuit has rejected a "talismanic rule that a class action may not be maintained where a fraud is consummated principally through oral misrepresentations unless those representations are all but identical." *In re First Alliance Mortgage Co.*, 471 F.3d 977, 990 (9th Cir. 2006) (internal quotation marks omitted). Nevertheless, a plaintiff in this circuit seeking to bring class claims based on alleged oral misrepresentations must at least establish that the misrepresentations were part of a "common course of conduct." *Id.* at 990; *see also Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is

---

[12] English also contends that Apple employees orally mislead and deceive customers by referring them to the AC+ and APP terms and conditions, or by using the "new or equivalent to new" language of the terms and conditions, when selling the service plans. *See, e.g.,* Reply at 3. The problem with this theory is that English lacks standing to bring it. English asserts that she was told "that the replacement devices would be new," not that she was referred to the terms and conditions or told language from the terms and conditions. California law does not authorize recovery for a consumer who was not exposed to the allegedly wrongful business practices at issue. *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 980 (2009); *accord Mazza*, 666 F.3d at 595; *see also Berger*, 741 F.3d at 1068 ("class certification of UCL claims is available only to those class members who were actually exposed to the business practices at issue"); *Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622, 634 (2010) (finding that named plaintiff lacked standing to bring FAL and UCL claims based on product labels and television commercials he did not view, where his "limited experience with respect to a particular label that he viewed is not representative of other consumers' experiences with respect to other aspects of [defendant's] [advertising] campaign").

united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable."). Class treatment may thus be appropriate, despite some variance in the specific language used, where "a standardized sales pitch is employed," or where there is other evidence of a "centrally orchestrated strategy" such that "the center of gravity of the fraud transcends the specific details of [the] oral communications." 471 F.3d at 991 (internal quotation marks omitted).

In *First Alliance*, for example, the defendant's sales agents "would employ a standardized sales presentation to persuade borrowers to take out loans with high interest rates and hidden high origination fees . . . and other 'junk' fees." *Id.* at 985. The sales agents were "trained . . . to follow a manual and script . . . which was to be memorized verbatim [and] executed as taught." *Id.* "[T]he elaborate and detailed sales presentation prescribed by the manual was unquestionably designed to obfuscate," and the sales agents were taught to "present the . . . disclosure documents in a misleading manner," and to "deflect attention away from things that consumers might normally look at." *Id.* In rejecting the defendant's argument that it was immune from class liability because there was no "specifically-worded false statement repeated to each and every borrower of the plaintiff class, traceable to a specific directive in the [manual]," the Ninth Circuit highlighted "the standardized training program for sales agents, which included a script that was required to be memorized and strict adherence to a specific method of hiding information and misleading borrowers." *Id.* at 991. This evidence of a "centrally orchestrated scheme to mislead borrowers through a standardized protocol the sales agents were carefully trained to perform" was sufficient to support the jury's finding of liability for the class.[13] *Id.*

The level of uniformity necessary to certify a class under the CLRA, FAL, and UCL based on alleged misrepresentations, oral or otherwise, is similar. *See Berger*, 741 F.3d at 1069 (affirming denial of class certification of CLRA and UCL claims where each of the defendant's allegedly misleading contracts required "an independent legal analysis to determine whether the language and design of that contract . . . did or did not expose that group of customers to a

---

[13] The Ninth Circuit also upheld the district court's decision to try the case on a class basis. *See First Alliance*, 471 F.3d at 990-91.

potentially misleading or deceptive statement"); *Davis-Miller v. Auto. Club of S. California*, 201 Cal. App. 4th 106, 125 (2011) ("An inference of classwide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class."); *Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 850 (2009) (affirming denial of class certification of UCL claims where the defendants' insurance policies were sold by independent agents who were not required to attend a training or adhere to a scripted sales presentation, such that resolution of the UCL claims would require an "inquiry into the practices employed by any given independent agent – such as whether the agent involved in any given transaction took [defendants'] training and read [defendants'] manuals or used the training and materials in sales presentations, and what materials, disclosures, representations, and explanations were given to any given purchaser"); *see also Cabral v. Supple LLC*, 608 F. Appx. 482, 483 (9th Cir. 2015) (in a case involving claims under the CLRA, FAL, and UCL, citing *First Alliance* for the proposition that "some deviations from precise wording in the language of advertisements or representations might not be fatal to class certification," but stating that "[i]n a case of this nature, one based upon alleged misrepresentations in advertising and the like, it is critical that the misrepresentation in question be made to all of the class members").

The allegations and evidence here do not establish the level of uniformity required for class treatment.  English does not identify any allegations in the TAC or any evidence on record supporting a plausible inference that Apple employees have used a "standardized protocol" of misrepresenting that all replacement devices under the service plans are new, or that Apple has otherwise perpetrated a "centrally orchestrated scheme" of oral misrepresentations to this effect. *See First Alliance*, 471 F.3d at 991.  In her motion, she argues not that Apple employees are "carefully trained" to "strict[ly] adher[e]" to a specific method of informing customers that all replacement devices are new, *see id.*, but rather that Apple uses "a form of 'do it yourself / learn as you go' training" with respect to the service plans, "placing the onus on the employee to figure out

United States District Court
Northern District of California

1   what 'functional equivalent to new in performance and reliability' means."[14]  Mot. at 6.  She states

2   that Apple provides no written training materials regarding the service plans, and that as a result of

3   this "inadequate training," Apple employees "cannot define [the] term 'functional equivalent to

4   new' – a term that Apple uses to avoid describing the refurbished nature of [the replacement

5   devices]."  *Id.* at 7.

6        While there might be situations in which an "inadequate training" theory is sufficient to

7   support certification of a class based on oral misrepresentations, this case is not one of them.  Even

8   the evidence submitted by English reveals significant and material variations between the oral

9   representations made by Apple employees when selling the service plans.  Salvador Toledo, a

10  former Apple store employee who submitted a declaration in support of class certification,

11  testified at his deposition that he "just always show[s] the customer [the] terms and conditions at

12  Apple.com."  Toledo Depo. at 113-14 (Patel Decl. Ex. I, Dkt. No. 209-10).  Randel Linthicum, a

13  current Apple store employee, testified at his deposition that when customers ask him "if the

14  replacement device would be refurbished," he tells them that "they would receive a device that is

15  the same exact device as the one that they are bringing in that is damaged.  I would also explain to

16  them that, no, the device would not be a new device off the floor."  Linthicum Depo. at 108-09

17  (Patel Decl. Ex. L, Dkt. No. 209-13).  Andrew Reed, another former Apple store employee who

18  submitted a declaration in support of class certification, states in his declaration that, "I often used

19  the word 'new,' as did other employees," to describe replacement devices under the service plans,

20  but that "[i]f a customer asked whether their replacement was new, I was trained to respond that it

21  could be, but that I did not know one way or the other."  Reed Decl. ¶ 4 (Dkt. No. 180-24).

22       In her reply brief, English abandons her "inadequate training" theory and asserts instead

23  that Apple employees are told in training that all replacement devices under the service plans are

---

[14] English repeatedly uses the phrase "functional equivalent to new in performance and reliability"
in her briefing to describe the alleged misrepresentations in the terms and conditions for the
service plans.  That phrase does not appear in the terms and conditions.  To reiterate, the current
AC+ terms and conditions refer to replacement products that are "new or equivalent to new in
performance and reliability," or that "will at a minimum be functionally equivalent to the original
product."  TAC Ex. B.  The AC+ and APP terms and conditions in effect until September 2013
similarly describe replacement devices as "new or equivalent to new in performance and
reliability," and "at least functionally equivalent to the original product."  TAC Ex. C.

new.  *See* Reply at 3.  But the documents English cites in support of this assertion do not come close to supporting it.  There is no evidence that any of Apple's training materials instruct or insinuate that all replacement devices under AC+ and APP are new.  At most, the documents cited by English show that Apple employees are trained to answer questions regarding the service plans by directing customers to the applicable terms and conditions or to the Apple.com website.  *See, e.g.,* Williams Depo. at 218 (Parker Decl. Ex. 14, Dkt. No. 214-21).  Neither the terms and conditions nor the Apple.com website, however, state that all replacement devices under the service plans are new.

Further, although English seeks to include individuals who purchased AC+ or APP online and over the telephone in the putative class, *see* Mot. at 13, she offers no evidence regarding any representations made by Apple employees in connection with the sale of service plans in either of these contexts.  Instead, she cites to three call logs showing what three different AppleCare agents said to customers either at the time those customers were receiving replacement devices or at some point thereafter, not at the time the customers purchased their service plans.  *See* Mot. at 8. Moreover, the call logs indicate not that the agents misrepresent to callers that all replacement devices are new, but, to the contrary, that they tell callers (and that callers are aware) that replacement devices are "refurbished" or "like-new:"

> Call Log Dated 12/30/2014 (APL00027871): Customer is replacing phone for AC+ . . . and has concerns about what it is being replaced with – assured customer that the replacement is not a refurbished device – assured it has not been previously owned, and has been manufactured with known-good parts – she is satisfied knowing this replacement will be like-new.
>
> Call Log Dated 01/23/2015 (APL00028152): [C]ustomer said that when she originally purchased the AC+ plan the rep assured customer that if any incident happened they would receive a NEW device as opposed to a refurbished device – explained to customer that our refurbished devices are just as good as new (in some cases better because they receive more testing).
>
> Call Log Dated 08/01/2014 (APL 000282321): [C]lient politely pleads for a new iPhone instead of a refurbished – he's had quite a few replacements already as refurbished and he states it's been a horrible 5 years with Apple.

Kennedy Decl. Ex. 32 (Dkt. No. 180-37).

United States District Court
Northern District of California

There is obviously some evidence here of consumers being told that all replacement devices under the service plans will be new.  *See, e.g.,* English Decl. ¶ 6; Reed Decl. ¶ 4.  But without evidence of a common course of conduct to this effect, English cannot establish predominance, as required for certification under Rule 23(b)(3).[15]  *See Mazza*, 666 F.3d at 596 ("A presumption of reliance does not arise when class members were exposed to quite disparate information from various representatives of the defendant.") (internal quotation marks omitted). On this record, her third theory of liability cannot be certified.

> **D.** **Fourth theory: Apple misrepresents in the terms and conditions for the service plans that replacement iPhones will be "new or equivalent to new in performance and reliability" and "functionally equivalent to the original product"**

This theory fails because it is undisputed that English did not view or rely on the AC+ terms and conditions in making her purchase.  English cannot bring claims under the CLRA, FAL, or UCL, or for fraud, based on misrepresentations she was not exposed to and did not rely on in making her purchase.  *See, e.g., Cohen*, 178 Cal. App. 4th at 980; *Pfizer*, 182 Cal. App. 4th at 634.

English responds that she did rely on the AC+ terms and conditions in that she relied on them "vicariously through the Apple employees who told her that her replacement iPhones would be new."  Reply at 13.  English cites no authority for this "vicarious reliance" approach, and I am not aware of any.  Moreover, she has not shown that she "vicariously relied" on the AC+ terms and conditions.  Her declaration does not indicate that either of the Apple employees she spoke with in February and July 2013 used language based on or similar to the alleged misrepresentations in the terms and conditions.  She states that the Apple employee in February 2013 told her "that the replacement devices would be new."  *See* English Decl. ¶ 6.  The terms and conditions in effect at the time, however, did not state that replacement devices would be new, but rather that they would be "new or equivalent to new in performance and reliability" and "at least

---

[15] English also moves for certification under Rule 23(b)(2).  *See* Reply at 20 n.8.  I agree with Apple that certification under Rule 23(b)(2) is not appropriate here.  *See Dukes*, 131 S. Ct. at 2557 (Rule 23(b)(2) does not authorize certification "when each class member would be entitled to an individualized award of monetary damages"); *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) ("individualized monetary claims belong in Rule 23(b)(3) rather than Rule 23(b)(2)") (internal quotation marks omitted); *see also Faulk v. Sears Roebuck & Co.*, No. 11-cv-02159-YGR, 2013 WL 1703378, at *5 n.4 (N.D. Cal. Apr. 19, 2013).

functionally equivalent to the original product."  TAC Ex. C.  The terms and conditions currently in effect use substantially similar language.  TAC Ex. B.  With respect to her interaction with the Apple employee in July 2013, English does not describe what language, if any, the employee used regarding replacement devices.

English also contends that reliance is not an element of her Secondhand Merchandise Labeling Law claims, or of her claims under the unfair prong of the UCL.  *See* Reply at 10-11.  But her Secondhand Merchandise Labeling Law claims have nothing to do with the terms and conditions for the service plans.  Those claims concern Apple's use of the plain, white, unbranded boxes to package its replacement devices, not the alleged misrepresentations in the terms and conditions.  *See* TAC ¶ 116.  The elements of a Secondhand Merchandize Labeling cause of action are irrelevant to this theory of liability.

English's contention that she is not required to establish reliance to bring claims under the UCL's unfair prong based on the alleged misrepresentations in the terms and conditions is also unpersuasive.  Courts require a showing of reliance from named plaintiffs asserting UCL claims based on alleged misrepresentations irrespective of which of the UCL's prongs the claims are brought under.  *See, e.g., Rahman v. Mott's LLP*, No. 13-cv-03482-SI, 2014 WL 5282106, at *7 (N.D. Cal. Oct. 15, 2014) ("The reliance requirement is also applied to the UCL's unfair prong, when – as is the case here – the underlying conduct is alleged to misrepresent or deceive."); *Kane v. Chobani, Inc.*, 973 F. Supp. 2d 1120, 1129 (N.D. Cal. 2014) ("[T]he actual reliance requirement also applies to claims under the UCL's unfair prong to the extent such claims are based on fraudulent conduct."); *Missud v. Oakland Coliseum Joint Venture*, No. 12-cv-02967-JCS, 2013 WL 3286193, at *20 (N.D. Cal. June 27, 2013) (dismissing claims under the UCL's unlawful, unfair, and fraudulent prongs "because plaintiffs still have not alleged that they purchased their tickets, or otherwise suffered economic injury, in reliance on any of the . . . misleading advertising"); *see also* Cal. Bus. & Prof. Code § 17204 (an action for relief under the UCL may only be brought by a private individual where the individual "has suffered injury in fact and has lost money or property as a result of the unfair competition").  The fourth theory of liability does not help English.

United States District Court
Northern District of California

United States District Court
Northern District of California

### E.    Fifth theory: Apple fraudulently omits that replacement iPhones under the service plans could be refurbished iPhones

Although the exact contours of English's omission theory are unclear, I do not see how the theory could be reasonably construed to support her claims on behalf of the class.  To the extent that English means to assert that the omission occurs when Apple employees discuss the service plans with purchasing customers, the theory fails for essentially the same reason as English's oral misrepresentations theory – i.e., because English has not shown that the way in which Apple employees talk about the service plans is sufficiently uniform to support an inference of classwide reliance or materiality.  For example, English contends that the alleged omission is material because "a warranty product that offers refurbished rather than new replacements is . . . plainly different and inferior . . . from a warranty product that offers actually new replacements.  Everybody would rather have a new phone than refurbished one."  Reply at 5.  As discussed above, however, the allegations in the TAC and the evidence on record do not support a plausible inference that putative class members have been uniformly (or even commonly) told that all replacement devices under the service plans will be new.

To the extent that English means to assert that the omission occurs in the AC+ and APP terms and conditions, the theory fails because, as stated above, English did not view or rely on the terms and conditions in making her purchase, depriving her of standing to bring the theory and rendering her an inadequate and atypical class representative with respect to it.  *See Cohen*, 178 Cal. App. 4th at 980; *see also Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (under the CLRA and UCL, actual reliance can be established for the purposes of a fraudulent omission claim by showing that, "had the omitted information been disclosed, one would have been aware of it and behaved differently") (internal quotation marks omitted).

English also contends that the replacement devices themselves improperly "omi[t] labeling that would indicate that the devices are refurbished."  Mot. at 2.  But the evidence that English received new devices instead of refurbished ones makes her an inadequate and atypical class representative with respect to this theory: even if Apple had labeled refurbished replacement devices as such, English would not have been viewed the labeling when making her purchase.  The fifth theory of liability does not provide a viable basis for class certification.

## II.     ENGLISH HAS NOT ESTABLISHED ADEQUACY OF COUNSEL

The various defects in English's theories of liability discussed above preclude certification of the putative class and subclasses.  An additional reason for denying English's motion has to do with the way in which this lawsuit originated and has been litigated.

Two of the three original named plaintiffs in this case, Adkins and Galindo, either were working or had worked for class counsel at the time they purchased AC+ and filed this lawsuit.  Dkt. No. 82.  One of them, Galindo, was class counsel's paralegal at the time.  *Id.*  Both Adkins and Galindo purchased AC+ on the same date, October 30, 2013, five days before filing the lawsuit, and both purchased their service plans using the "monetary gifts" class counsel had given them shortly before.  *Id.*  Following instructions from class counsel, Galindo brought two audio recorders with her to the Apple store on October 30, 2013 for the purpose of recording her "whole transaction experience with Apple."  Galindo Depo. at 60.

Class counsel's prior relationship with Adkins and Galindo and her involvement in their purchase of AC+ continue to taint this case.  The record strongly indicates that Adkins and Galindo purchased their AC+ plans at class counsel's direction for the purpose of initiating this lawsuit.  At the very least, it is undisputed that they did so using funds class counsel had given them, and that class counsel instructed Galindo, her paralegal at the time, to record her interactions with Apple employees while making her purchase.  Given these facts, there is little question that Adkins and Galindo would not have been adequate class representatives had they remained in the case, and that class counsel could not have adequately represented the class on their behalf.  *See Redman v. RadioShack Corp.*, 768 F.3d 622, 638 (7th Cir. 2014) (noting the concern that the lead named plaintiff was employed by a law firm for which the principal class counsel once worked, and stating that "named plaintiffs are . . . charged with monitoring the lawyers who prosecute the case on behalf of the class," such that "[t]here ought . . . to be a genuine arm's-length relationship between class counsel and the named plaintiffs"); *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1167 (9th Cir. 2013) ("The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel.") (internal quotation marks omitted); *Creative Montessori Learning Centers v. Ashford*

23

United States District Court
Northern District of California

1   *Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011) ("When class counsel have demonstrated a lack of

2   integrity, a court can have no confidence that they will act as conscientious fiduciaries of the

3   class."); *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 95 (7th Cir. 1977) ("Even though plaintiff

4   does not expect to share in any attorney's fees recovered in this cause, there exists the possibility

5   that one so situated will become more interested in maximizing the 'return' to his counsel than in

6   aggressively presenting the proposed class action.").  Class counsel recognized as much when,

7   nearly one year after filing the original complaint, she sought precertification discovery to identify

8   class members, stating that such discovery was necessary in part because "it is understood that the

9   Court may choose to disallow plaintiffs' counsel from representing [Adkins and Galindo]."  Dkt.

10  No. 82; *see also Adkins v. Apple Inc*, No. 14-cv-01619-WHO, 2014 WL 4618411, at *3-5 (N.D.

11  Cal. Sept. 15, 2014) (denying motion to identify class members).  The fact that Adkins and

12  Galindo are no longer in this case, and the introduction of Kershaw Cutter & Ratinoff LLP

13  ("KCR") as co-counsel shortly after English filed her opening brief in support of class

14  certification, alleviate these concerns to some degree, but not enough to preclude them from

15  weighing against class certification.  *Cf. Sipper v. Capital One Bank*, No. 01-cv-09547, 2002 WL

16  398769, at *3-5 (C.D. Cal. Feb. 28, 2002) (denying class certification due to class counsel's

17  failure to disclose his business relationship with one of the named plaintiffs, where "neither the

18  mere addition of different [named] plaintiffs nor of different class counsel can save this particular

19  action from the appearance of impropriety").[16]

20      Class counsel's total lack of experience with class action litigation, and her pervasive

21  failure to comply with basic federal and local rules and with my standing orders throughout the

22  course of this litigation, further undermine English's request for class certification.  *See Sweet v.*

23  *Pfizer*, 232 F.R.D. 360, 370-71 (C.D. Cal. 2005) (finding class counsel inadequate based on their

24  lack of class action experience and their poor quality representation up to that point).  I agree with

---

26  [16] To be clear, this is not a case where the class counsel merely solicited a person to serve as a
    named plaintiff.  *Cf. Newberg on Class Actions* § 3:78 (5th ed.) ("There is nothing unethical about

27  solicitation in class action cases per se; only when that solicitation violates ethical rules will it
    preclude a finding of adequacy.").  Rather, the evidence here strongly indicates that class counsel

28  instructed Adkins and Galindo to purchase the service plans that gave rise to their claims, and
    gave them the funds to do so.

Apple that class counsel's "pattern of improper litigation conduct throughout the life of this case has caused unending and unnecessary distractions and delays in this litigation," Opp. at 34, prejudicing the putative class and unduly burdening Apple, its attorneys, and the Court.  As with class counsel's involvement in the inception of this case, her inexperience and poor performance to date are not adequately addressed by the recent appearance of KCR as co-counsel.  KCR certainly has sufficient experience and ability to serve as class counsel, and Mr. Cutter represented at the class certification hearing that his firm would be in the case for the duration.  However, three different sets of co-counsel have previously made appearances in the case only to withdraw within, at most, two-and-a-half months.  *See* Dkt. No. 128 (January 28, 2015 notice of appearance of Mark Mauser); Dkt. No. 146 (March 20, 2015 withdrawal of Mark Mauser); Dkt. No. 143 (March 17, 2015 notice of appearance of Steven Weinmann); Dkt. No. 163 (June 1, 2015 withdrawal of Steven Weinmann); Dkt. No. 162 (June 1, 2015 notice of appearance of the Brandi Law Firm); Dkt. No. 171 (June 16, 2015 withdrawal of the Brandi Law Firm).  Moreover, this case has always been and continues to be class counsel's; she is its source and its driver, and neither the dubious manner in which this litigation commenced nor the manifestly incompetent manner in which it has been conducted are cured at this juncture by yet another new co-counsel. English has not established adequacy of counsel under Rule 23(a)(4).

### III.      ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

The parties filed several administrative motions to file under seal in conjunction with the briefing on the motion for class certification.

On August 6, 2015, I issued an order on the various sealing motions English had filed in conjunction with her opening brief.  Dkt. No. 202.  I conditionally granted some of the sealing requests and denied others without prejudice.  *Id.*  On August 13, 2015, Apple filed a revised declaration in support of sealing.  Dkt. No. 205.  All sealing requests in the revised declaration, as well as all sealing requests previously conditionally granted, are GRANTED.[17]

---

[17] For the reasons stated in the August 6, 2015 Order, I continue to apply the "compelling reasons" standard to the parties' sealing requests.  *See* Dkt. No. 202 at 2-3; *see also Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006).

United States District Court
Northern District of California

On September 9, 2015, Apple filed a sealing motion in conjunction with its opposition brief.  Dkt. No. 208.  Those sealing requests are decided as follows:

| Dkt. No. | Document Name | Portions Identified for Sealing | Ruling |
|---|---|---|---|
| 208-3 | Opposition Brief | 7: 10-12, 21-25<br>8: 2-9, 11-12<br>20: 2-3, 5-8<br>33: 19-23<br>34: 4-10 | DENIED as to 33:19-23 and 34:4-10.<br><br>GRANTED in all other respects. |
| 208-17 | Lanigan Decl. | 1: 6-8, 18-21, 24-28<br>2: 4-6, 7-9, 11-16, 16-17, 18-24<br>3: 2, 3, 4, 6, 8, 10 | GRANTED. |
| 208-19 | Macariola Decl. | 1: 7-8 | GRANTED. |
| 208-15 | Garbutt Decl. | 1: 8, 10-16 | GRANTED. |
| 208-21 | O'Neill Decl. | 1: 10-11, 13, 15-21, 23, 25, 27<br>2: 2-3, 6-10 | DENIED as to 1:18-21 and 2:6-10.<br><br>GRANTED in all other respects. |
| 208-12 | Lanigan Depo. | 94: 1-25<br>128: 1, 4-7, 17, 24<br>129: 1-25 | GRANTED. |
| 208-25 | Lall Rpt. | ¶¶ 16(c), 30-31 | GRANTED. |
| 208-5 | English Depo. Ex. 11 | Various | GRANTED. |
| 208-7 | English Depo. Ex. 13 | Various | GRANTED. |
| 208-9 | English Depo. Ex. 15 | Various | GRANTED. |
| 208-11 | Williams Depo. Ex. 120 | All | GRANTED. |
| 208-23 | O'Neill Decl. Ex. A | All | GRANTED. |
| 208-14 | Dixon Employment Records | All | GRANTED. |

Finally, on September 30, 2015 and October 1, 2015, English filed her reply brief and various accompanying documents under seal on the ground that the underlying information had

United States District Court
Northern District of California

been designated as confidential by Apple.  Dkt. Nos. 211, 213-14.  Then, on October 12, 2015,

English filed a motion for leave to file a notice of errata seeking "to correct certain clerical errors

in the filing of [her] reply brief."  Dkt. No. 220-10.  English filed another sealing motion in

conjunction with the notice of errata, again on the ground that the underlying information had been

designated as confidential by Apple.  Dkt. No. 220.  Apple subsequently filed a declaration in

support of sealing.  Dkt. No. 223; *see also* Dkt. No. 223-1 (proposed order).  Those sealing

requests are all GRANTED.

## CONCLUSION

For the foregoing reasons, English's motion for class certification is DENIED WITH

PREJUDICE.  The parties' various administrative motions to file under seal, Dkt. Nos. 208, 211,

213-14, 220, are decided as stated above.  Apple's unopposed motion for leave to file a surreply,

Dkt. No. 217, is GRANTED.  English's motion for leave to file a notice of errata, Dkt. No. 220-

10, is also GRANTED.

A Case Management Conference is set for February 9, 2016 at 2 p.m.  The parties shall file

a Joint Case Management Statement by February 2, 2016 proposing a schedule to address the

remaining issues in this case.

**IT IS SO ORDERED**.

Dated: January 5, 2015

_____
WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California