1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3      Before The Honorable William H.  Orrick, Judge

4

5  ADKINS, et al.,                )
                                  )
6           Plaintiffs,           )
                                  )
7  vs.                            )   No. C 14-01619-WHO
                                  )
8  APPLE, INC., et al.,           )
                                  )
9           Defendants.           )
   _____)
10
                              San Francisco, California
11                            Wednesday, October 14, 2015

12

   <u>TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND</u>
13            <u>RECORDING 3:14 - 4:05 = 51 MINUTES</u>

14  <u>APPEARANCES</u>:

15  For Plaintiffs:
                              Cutter Law, P.C.
16                            401 Watt Avenue
                              Sacramento, California 95864
17                        BY: CURTIS BROOKS CUTTER, Esq.
                              JOHN R. PARKER, JR., Esq.
18
                              1620 South Friendswood Drive
19                            Ste Apple
                              Friendswood, Texas 77546
20                        BY: RENEE FAGAN KENNEDY, Esq.

21  For Defendants:
                              Morrison & Foerster, LLP
22                            707 Wilshire Boulevard
                              Suite 6000
23                            Los Angeles, California 90017
                          BY: PURVI GOVINDLAL PATEL, Esq.
24

25          (APPEARANCES CONTINUED ON NEXT PAGE)

2

1   <u>APPEARANCES</u>:   (Cont'd.)

2   For Defendants:
                              Morrison & Foerster, LLP
3                             425 Market Street
                              San Francisco, California
4                                94105
                          BY:  PENELOPE ATHENE PREOVOLOS,
5                                Esq.
                              MARGARET ELIZABETH MAYO, ESQ.
6
    Transcribed by:           Echo Reporting, Inc.
7                             Contracted Court Reporter/
                              Transcriber
8                             echoreporting@yahoo.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

<u>Wednesday, October 14, 2015</u>                                    <u>3:14 p.m.</u>

1  <u>Wednesday, October 14, 2015</u>                                    <u>3:14 p.m.</u>

2                       P-R-O-C-E-E-D-I-N-G-S

3                            --oOo--

4           THE CLERK:  Calling civil matter 14-1619, Adkins,

5  et al. versus Apple, Incorporated.

6       Counsel, please come forward and state your appearance.

7           MR. CUTTER:  Afternoon, your Honor.  Brooks Cutter

8  for Plaintiffs.  With me are Renee Kennedy and John Parker.

9           THE COURT:  Good afternoon.

10          MS. PREOVOLOS:  Good afternoon, your Honor.

11  Penelope Preovolos for Defendants, and I have with me my

12  colleagues, Ms. Patel, Purvi Patel, and ms. Mayo, Maggie

13  Mayo.

14          THE COURT:  Afternoon.

15       All right.  Sorry to keep you so long waiting for your

16  time at the podium.

17       Mr. Cutter, welcome to this case, and so tell me what

18  your role is in this case now and going forward.  I know

19  that you came in a couple of months ago I guess.

20          MR. CUTTER:  Yeah, absolutely, your Honor.  So my

21  role, as I understand it, would be to be co-lead counsel in

22  the case, and that's a role I'm accustomed to, that I've had

23  in lots of other class actions and MDL matters, and I'm

24  pleased to join in the case and to, you know, bring some

25  additional resources and class expertise to the matter that

4

1  Ms. Kennedy's been earnestly litigating for the past several

2  years.

3          THE COURT:  All right.  So before -- I've got a

4  number of comments about -- about the motion, but I have a

5  factual question which is when was the first time the

6  Plaintiffs were aware that Apple's position was that Ms.

7  English received a new rather than a refurbished phone?  I

8  suspect you will both have different perspectives on that,

9  but, Mr. Cutter, do you know?

10         MR. CUTTER:  Our perspective is that we became

11  aware of that at the time they filed their opposition to

12  class certification.  In discovery they denied that it was a

13  refurbished phone, but they had so many objections to the

14  use of the term "refurbished" that that wasn't necessarily

15  any kind of an indication that they were contending that it

16  was not, that it was a new phone.

17     Ms. Preovolos?

18         MS. PREOVOLOS:  Your Honor, I don't think there's

19  going to be a dispute.  We disclosed that the phone was new

20  for the first time in the opposition brief because we

21  learned of that fact shortly before we -- very shortly

22  before we filed the opposition brief, and to put a little

23  context around that, which I think would be useful for the

24  Court, we have been earnestly trying to answer a question

25  Plaintiffs have asked and we've asked, which is is Apple

5

able to determine in a systemic way whether a particular

Apple Care Plus or APP consumer who received a replacement

unit received a new, remanufactured, or what we're calling

reclaimed part.  And it turns out we still don't know the

answer to that.  We have not been able to do it, but what we

found out we could do in the course of that exercise was

that it is possible to take a particular serial number --

and we've been trying to figure this out from the beginning

of the case obviously, but in our work with Mr. Lanagan

(phonetic), whose deposition was the one sort of on the

technical side of the Apple case, during our work with Mr.

Lanagan, we became aware -- and I need to be a little

careful because this is in -- in open court, in terms of

Apple's confidentiality -- but we became aware that for an

individual serial number, it is possible looking at some

very highly proprietary databases which only a few people

have access to, we are able to -- we were able to figure out

the answer to that question for Ms. English and for Ms.

Kennedy, and -- but we are talking about a process that took

hours and days of time, and it's not a simple answer.  We're

confident of it, but the other point is we weren't totally

confident of it until the day we filed the brief, and I was

not about to make that representation to anyone until we

were confident of it, and it took a lot of checking and

rechecking.  Ms. May did a lot of the legwork on that, as

6

1  did our clients, and I wish it were simpler.

2      The truth is, you know, it's not an everyday issue that

3  people care about in the real world, but that's the answer.

4  There's no dispute about it.

5          THE COURT:  All right.  Well, so, I mean, it is an

6  issue that I care about.

7          MS. PREOVOLOS:  Of course.

8          THE COURT:  And it's pretty relevant to at least

9  some of the issues in this motion, and I'm wondering what

10 the best -- fastest and most efficient way of letting the

11 Plaintiffs test your allegations with respect to that, your

12 evidence with respect to it is.  Is it the deposition of Mr.

13 Lanagan again?

14         MS. PREOVOLOS:  Well, I guess I would say that the

15 issue of what we could know and what we did know was

16 discussed during the deposition of Mr. Lanagan.  The

17 Plaintiffs had three weeks before they filed their papers to

18 seek that discovery, and they didn't do it.  They didn't --

19 they didn't ask that question.

20         THE COURT:  Yes, but what you've alleged is, I

21 think, in some -- with some issues dispositive, maybe with

22 many issues.  And so -- and you allege that only -- and I'm

23 not blaming you because of what you're finding out, but so

24 my -- but it seems to me that the Plaintiff's entitled to

25 test it.

7

1          MS. PREOVOLOS:  I think the -- my point is that

2  the Plaintiff had three weeks to try to test it, and they

3  didn't do that.

4          THE COURT:  But you didn't make the allegation.

5  They were testing something that they didn't know.

6          MS. PREOVOLOS:  No, no, no.  Your Honor, the

7  Plaintiffs' brief wasn't due until three weeks after --

8          THE COURT:  Oh, I see what you're saying.

9          MS. PREOVOLOS:  -- we made that allegation and

10  discovery was opened.  The Plaintiffs are suggesting that we

11  should depose their newly disclosed reply expert two days

12  before this hearing.  My point is if the Plaintiffs had

13  serious questions about that evidence, they've had three

14  weeks to ask us for discovery.  Discovery wasn't closed.

15  Discovery has been wide open.  They were suggesting we take

16  it.  They took discovery of our experts during that time

17  period.  They never sought discovery of this issue.

18          THE COURT:  If -- do you care?

19          MR. CUTTER:  Well, your Honor, I think I care

20  about several things about this.  First of all, I would

21  argue that Ms. English is more than adequate and typical in

22  terms of having bought a product, Apple Care Plus, and not

23  -- and having had a false representation made to her and, as

24  a result, having paid more than she would have.  In effect,

25  what she thought she was getting was a product that promised

8

1    her two potential incidents of new phones in exchange for

2    $99 and $79 per incident.   In effect what she received was a

3    lottery ticket for potentially a new phone or potentially a

4    used phone.   That transaction was complete at the moment she

5    paid the money for the warranty, and the case law is clear

6    that having overpaid for the warranty, she then -- it

7    doesn't matter if eventually her ship came in and she had

8    new phones or not.   There are going to be some people in the

9    class as to whom that's true who got old phones, and they're

10   going to be entitled to a different kind of damages, an

11   additional set of damages than the people who simply

12   overpaid for what I'll call the lottery form of Apple Care

13   that they actually received.

14        And this -- this line of thinking, you know, dovetails

15   exactly -- I went back, you know, as part of familiarizing

16   myself with the case -- with the Court's thinking in the

17   12(b) motions, your analysis, for example, with Mr.

18   Galindo's.   Mr. Galindo purchases the warranty, never uses

19   it, but, nevertheless, he has Article 3 standing because he

20   overpaid for the warranty.   Ms. English is similarly

21   situated   She overpaid for a warranty that, as we'll

22   eventually establish when we get into damages models, people

23   will pay less every single time for a warranty that offers a

24   used phone replacement than they will for a warranty that

25   offers a brand new phone replacement, and --

9

1          THE COURT:  So you're telling me you actually

2   don't care about whether Apple's allegation is verified now

3   by you or not?

4          MR. CUTTER:  I --

5          THE COURT:  You think it probably is true?

6          MR. CUTTER:  You know, I have no reason not to

7   take Ms. Preovolos, who's distinguished counsel, lot of

8   experience, that she -- likely it's true, but I would say

9   this about that.  This is what I would ask the Court to do,

10  that if it's important -- and it probably is important, I

11  believe, actually, that we do eventually have a subclass

12  representative who got an old phone, and I think we can find

13  one.  I think we can identify one with reasonable expediency

14  and -- and add them in in addition to Ms. English in this

15  case, and that's routinely done in cases like this in

16  circumstances like this arising.  There's certainly no delay

17  on our part having just learned of this fact with respect to

18  Ms. English.

19      So rather than get into a land ward or trench warfare

20  over whether Ms. English's phone was new or used, we'll come

21  up with some additional folks, but it will be important to

22  have a process that we agree on to test that.  In other

23  words, to talk to the guy, you know, one of the three people

24  who can google it into their computer and say is this a new

25  or used phone, and to establish ourselves the bona fides of

10

1 that person in the process.

2     So I think that perhaps I'm coming at it a little

3 differently than you, but we get to the same place.  It is

4 important to figure it out.

5         THE COURT:  Okay.  Well, let me tell you where --

6 where I'm coming out in general, and -- and then -- and I

7 heard your -- your take on some of this already, but let me

8 just step back.  I'm right now inclined to deny

9 certification.  The -- first of all, I don't think there's a

10 theory of liability -- particularly if this evidence is

11 correct, I don't think there's a theory of liability that

12 provides a basis for a certifiable class.  So I've

13 identified five theories.  One is class members who

14 purchased Apple Care Plus with the replacement iPhone, and

15 the initial replacement would not count as an accidental

16 damage incident, but it did.

17     Apple admits the policy but complied with it, and --

18 and the Plaintiffs offered no evidence to the contrary

19 except for what Ms. English had to say.

20     Second, Apple improperly packaged refurbished phones in

21 a plain white unbranded box.  If Ms. English got a new phone

22 and not a refurbished phone, I think there are typicality

23 and adequacy problems with that.

24     Apple employees -- the third one is Apple employees

25 orally misrepresented the replacement phones will be new.

11

1  Again, Ms. English got a new phone, and also there is no

2  common course of conduct shown in the evidence.

3      Fourth, Apple misrepresents in service plans that

4  replacement iPhones will be new or equivalent to new.

5  Again, Ms. English got a new phone, and she didn't rely on

6  the service plans in purchasing the iPhone.  I don't

7  understand the theory of vicarious reliance.

8      And then, fifth, Apple fraudulently omits that

9  replacement phones may be -- may be refurbished.  Again, Ms.

10  English got new phones, but there's insufficient evidence of

11  uniformity of conduct.

12      And then I'm also interested -- it's not clear to me

13  from the briefing -- maybe it should be -- whether Ms.

14  English received the document that was called "Genius Bar

15  Work Authorization and Service Confirmation" when she

16  purchased the February 13th Apple Care Plus, but -- but that

17  refers to new or refurbished parts or products.

18      So I have trouble with those theories.  I have real

19  trouble with the adequacy of class counsel and not you, Mr.

20  Cutter, but the way that this case has been litigated from

21  the get go has been very troublesome.  The -- the fact that

22  the Plaintiffs received gifts, the first Plaintiffs received

23  gifts from Ms. Kennedy before they bought their phones, Ms.

24  Kennedy's substantial involvement with buying Apple

25  products, the fact that five -- all the original Plaintiffs

12

1  withdrew and then two came in and then one left and the one,

2  Ms. English, bought her phone for her son.  It just taints

3  the -- the case in a way that I find really problematic.  I

4  appreciate the fact that you're here, but that's -- that

5  really has been a problem, and then, frankly, the damages

6  theory is -- is hard for me to wrap my head around.  So I

7  want you to talk -- talk to me about that.  It doesn't

8  justify how the damages flow solely from the Defendant's

9  conduct.  The models seem to compensate class members who

10 weren't harmed, and -- and the restitutionary disgorgement

11 theory is one that I just wrote about in Cacent v. Bigalo

12 which I just don't think works in this setting where the --

13 the class members actually received a product in return.

14 There's got to be -- there's got to be something more than

15 getting the whole price of Apple Care Plus.

16      So, anyway, those are among the problems that I have.

17 So it's a -- it's a high hill you're climbing up, Mr.

18 Cutter.  So go ahead.

19           MR. CUTTER:  Let me begin.

20           THE COURT:  Okay.

21           MR. CUTTER:  So I'll begin with your point four

22 because I think it's important to the over-arching approach

23 that we have to the case, and that's with the service plan

24 and the service plan product.  And, you know, I had to think

25 about this for a while too, but really the product that's at

13

1  issue here is the service plan, and that service plan

2  contains a core false statement, which is that the phones

3  that you receive are new or equivalent to new in performance

4  and reliability.  That's false, and that's Doctor Peck,

5  who's preeminent in his field, who says that -- well, first

6  of all, it's false because even by Apple's own admission,

7  less than half the phones that you're likely to get are new.

8  Some percentage are lemon phones or remorse phones, as they

9  call them, that people sent back after a couple of weeks and

10 they recycled through.  Another percentage are phones that

11 they parted out and sent back to China and had them

12 reassembled and sent back.

13      So, clearly, the new part is not true.  It's only true

14 in some cases.

15      The second piece of that, the new in performance and

16 reliability is true and simple junk science.  It's not true.

17 It's demonstrably false, and Doctor Peck will be dispositive

18 on that issue.

19      So we begin with I think one of the clearest cases of a

20 false statement at the class certification stage of many

21 cases that I've seen.  We have a clear false statement.

22 Now --

23          THE COURT:  Did Ms. English rely on that, on the

24 terms and conditions?

25          MR. CUTTER:  I was just going to move to that.

1            THE COURT:  Okay.

2            MR. CUTTER:  And so -- and so we then have to look

3    at -- at how that -- where that statement appears, okay, and

4    how that statement pervades Apple and all its training and

5    everything that they do, and so it's in the terms and

6    conditions.  It's in the training materials that we

7    submitted, your Honor.  The consistent flow of the workflow

8    of the training is when you get to this point, you're going

9    to review the terms and conditions which say that phones are

10   new, that the phones you'll get are new or new in

11   performance and reliability.  And so that's the core

12   statement that is always trained, and so that's a core false

13   statement that's repeated in the training, repeated in the

14   terms and conditions in which the -- every Apple employee

15   that testifies -- maybe not every.  I shouldn't -- I'm not

16   as familiar with the record as I would be if I had taken

17   these depositions, but clearly Mr. Bund (phonetic) testified

18   that that's what he always told folks.  Tara Ford said that

19   that's what the standard was, new or like new.  So they're

20   perpetuating and stating a false standard.  And so what Ms.

21   English heard from Mr. Posturak (phonetic) was the exact

22   statement that's in the terms and conditions, that you'll

23   get a new phone.  He left out the second part, and I don't

24   blame him because if -- if two of the four adjectives that

25   you're hearing or the only two adjectives are new or like

1   new, then I don't blame him for conflating them and just

2   saying you're going to get a new phone.  But there's no

3   question that we can trace that tree, from all the training

4   that Apple does, into the terms and conditions, into the

5   plan itself and that that's what he's communicating.  He's

6   orally communicating the core written terms and conditions

7   to Ms. English, and that's what she's relying upon when she

8   -- when she makes that purchase, and I don't think that any

9   case has said that it's -- that it's less actionable if the

10  Plaintiff hears it rather than reads it, as long as we can

11  trace the same source, and here we easily can do that from

12  the core false statement that permeates the terms and

13  conditions and the training and the Apple Care Plus and

14  Apple Care documents themselves.

15       And the interesting thing about this is -- which kind

16  of in my mind it's not necessary for us, but it -- but it

17  kind of shows scienter is that Apple knows how to disclose

18  it in that document that you alluded to.  After they've

19  taken your money and after they -- when you're on your way

20  out the door, they E-mail you or stick a receipt in the bag

21  that says that, "By the way, we may have repaired your phone

22  with used or refurbished parts," or you may have received

23  used or refurbished parts, a term that they're very careful

24  not to use when they're selling the thing to you up front.

25  So they knew what they were doing, but they chose

16

1   deliberately to word it and to use a completely different

2   term, one that has no basis in science or truth.  I mean, if

3   you think about it, parts are like humans have heartbeats.

4   You know, everything -- everything, every part has a certain

5   number of cycles in it, and Apple's not tracking that at all

6   when they take these things back.  If they pass the test,

7   they send them along, you know.  I like Warren Miller's

8   statement that for skiers -- that moguls are like

9   heartbeats.  We all have a finite memory, but --

10              THE COURT:  I have about one.

11              MR. CUTTER:  Right.

12              THE COURT:  But the -- so in answer to the

13  question that I had --

14              MR. CUTTER:  Yeah.

15              THE COURT:  -- that Ms. English received it but it

16  was after, and your point is that it's not really -- it's

17  not relevant to the claims that you're bringing because

18  you're talking about sales as opposed to after sales.  Is

19  that the --

20              MR. CUTTER:  Exactly.  And, if anything, it's

21  helpful to us because it shows the difference between what a

22  fulsome disclosure is, when it's too late to matter, and the

23  false disclosure that's made up front.  So the point about

24  -- and so then returning to the point about the product, the

25  service plan being the product.

1        So at the time Ms. English completes that purchase,

2   she's overpaid for the warranty plan, and to me the cases

3   that -- the case that's most similar to this one is <u>Cole v.</u>

4   <u>Asyrian</u>, and that's Judge Gutierrez's analysis of a cell

5   phone insurance plan in the Central District, and he -- it's

6   really very similar, and what he concludes is that there

7   also the class representative ended up getting a new phone,

8   and he said the point isn't that they got the new phone.

9   It's that they overpaid for this insurance, that they paid

10  more for the insurance than they would have paid if they

11  knew it just gave them a possibility of getting a new phone.

12  So that's the way we have to think about it.  We have to

13  think about it what product did you buy, did you buy a

14  product that promised you a new phone or did you buy a

15  product that promised you a chance of a new phone.

16       There's a price differential that we'll establish, and

17  that's kind of a natural segue into the damages analysis.

18  We are not going to claim that the proper measure of

19  restitution is the full price of the plan.  I agree with you

20  on that.  What we're going to claim and establish through

21  Christian Tragulus (phonetic) is that the appropriate

22  measure of damages is the difference between what a consumer

23  would pay for a plan that offers you a new phone and

24  guarantees you a new phone if you dropped your phone in the

25  toilet, what you get if you purchase a plan that offers you

18

1 a used, refurbished, you know, remorse, lemon or maybe a new

2 phone.

3          THE COURT:  Am I remembering correctly that Mr.

4 Tragulus -- and I know I just mispronounced his name --

5          MR. CUTTER:  I probably did too.

6          THE COURT:  -- appeared on the scene for the reply

7 brief?

8          MR. CUTTER:  That's correct, your Honor.  We

9 retained him after we were brought into the case and after

10 we saw where we were in terms -- we thought it was

11 appropriate.  We wanted to bring more horsepower to bear on

12 that point, and we made him available and, you know, I

13 wouldn't argue with Ms. Preovolos, we would have liked to

14 have had more time for that, but that's -- somehow we

15 thought it was more important to bring that -- that analysis

16 to bear and for the Court to have the benefit of that.  I

17 think it's worth keeping in mind that we still are a long

18 way from trial, and there'll be plenty of opportunity to

19 depose and test these theories and make Rule 56 motions as

20 appropriate, but we wanted to have the -- to have the Court

21 -- have our perspective before the Court of what could be a

22 coherent damages model based around the price differential

23 between a solid product that offers you a new phone versus a

24 product that offers you a chance of a new phone, and that

25 would be the core damages model for the people like Ms.

19

1  English and the entire class would fall into.

2      Now, there is an important couple of other classes, and

3  we would think it would be appropriate to get somebody, you

4  know, appropriate representative for what I'll call subclass

5  one, in other words, the people who not only bought the

6  product and overpaid for the product of the warranty plan

7  but then suffered essentially the consequential damages

8  which I would say is recoverable under the CLRA but not

9  under the UCL of getting a used phone and not a new phone,

10 and that price differential is establishable by, you know,

11 market conditions, and I think, as Mr. Tragulus points out,

12 that calculation will benefit Apple because people in the

13 open market have already evidenced their willingness to buy

14 a refurbished phone and will help pay for it versus people

15 who are having it hoisted upon them in the service incident

16 environment.  And so that's how we would analyze that.

17      And then the final category, the subclass that Ms.

18 English remains a member of, is this denied in incident

19 category, and that would be -- what I'd perceive as the

20 damages model that we'd utilize there would be whatever the

21 cost of the phone you had to go out and get because you

22 didn't get your incident model, your incident opportunity

23 minus what you would have paid for the incident opportunity.

24          THE COURT:  Did I miss the evidence on that,

25 though?  I mean, the only evidence I saw that would support

20

1   Ms. English's theory is what she said.

2           MR. CUTTER:  On the -- on the denial of the

3   incident?  No, I think there's a -- there is a document that

4   shows that she came in with a phone, and it says that there

5   was a problem with the phone and that she was not able to --

6   that it would not qualify for a warranty.

7           THE COURT:  That's it, though?  I mean no --

8           MR. CUTTER:  That's correct.

9           THE COURT:  I -- the schedule for this class

10  motion was continued I think a couple of times to make sure

11  that -- and there are all sorts of discovery issues that --

12  that we worked through over time, and the discovery was a

13  lot broader than I know the Defendant was hoping it was

14  going to be, and I'm left with a record without a lot of

15  common course of conduct in it, and -- and before you -- I

16  let you stop talking, I do want you to speak to the adequacy

17  of counsel issue.

18          MR. CUTTER:  I'd be happy to, your Honor.

19  Interestingly, in the Cole case, Judge Gutierrez had

20  concerns about adequacy of counsel, and he was reassured by

21  the appearance of Girardi Case (phonetic) in that case,

22  and --

23          THE COURT:  Well, they didn't appear for a little

24  bit.

25          MR. CUTTER:  Pardon me?

1          THE COURT:  Ms. Kennedy had I think five or six

2    other lawyers before you.  So --

3          MR. CUTTER:  Well, I certainly, you know --

4          THE COURT:  I'm glad to see you.

5          MR. CUTTER:  Thank you, your Honor.  I'll address

6    it this way, in two ways.  First of all, in my review of the

7    work that's been done, there's been a lot of solid work done

8    with a lot of diligence by a person, you know, making their

9    first foray into this level of litigation against this level

10   of opposition, and -- and really, you know, a little bit of

11   David versus Goliath struggle.  And so I appreciate and I

12   honor that work.

13        The second point I'll bring to bear is that we're in

14   this case.  We're committed to it.  We're going to see this

15   case through.  We feel -- I like the case.  I think the

16   merits are -- are strong and that we're used to these

17   fights, you know.  I -- I just in the past year have

18   finished a case in front of Judge Selna where I was co-lead

19   in a medical device case involving 1,000 claims.  I've been

20   on steering committees.  I've been, you know, appointed co-

21   lead in MDL matters.  I understand the scale, and I

22   understand the complexity.  I'm used to litigating.  I have

23   a case going to trial in Santa -- in San Jose next month

24   against both Skadden Arps and Robie Matthai, a certified

25   class action against State Farm.  So it's the kind of fight

22

1  I'm used to and I expect.

2      And the last thing I'll say is that I'm also used to

3  working in teams.  So I'm happy to work with Ms. Kennedy,

4  but if it ever appears that we need additional resources, I

5  know that I could get those by picking up the telephone.  We

6  have people who I've stood shoulder to shoulder with, firms

7  of like caliber to mine who would be happy to jump in with

8  me.  So I think my firm's more than adequate to the task,

9  but I know with utmost confidence that we could bring even

10  more resources if we needed to, not -- not to toot my own

11  horn at all but simply because I'm in the case and I'm

12  committed to it and because I've been there for other folks

13  with -- with good firms and have had good success in the

14  past in other matters.

15          THE COURT:  Ms. Preovolos?

16          MS. PREOVOLOS:  Your Honor, I'm struck with the

17  possibility of snatching defeat from the jaws of victory,

18  but I --

19          THE COURT:  No, I think you should -- I think you

20  want to respond to Mr. Cutter.

21          MS. PREOVOLOS:  I do want to respond, but my point

22  in saying that is that if there's -- if there are particular

23  issues the Court wants me to address, let me do that.

24  Otherwise, let me just step through what we've heard here.

25      But, you know, I want to step back for a minute, and,

23

1 you know, I have all kinds of regard for esteemed opposing

2 counsel, and I do, and I don't have any question about his

3 ability, but this case has been going on for two years next

4 month.  My client has spent -- you know, I understand it's a

5 large company, but we have spent extraordinary amounts of

6 time and money, and I don't expect that it's fair to say,

7 "Well, no, there are real questions about why this case was

8 broad, about it's -- it's the legitimacy of its foundation,

9 about its source, but we're going to start over right now."

10 I don't think that's fair.  I just plain don't think that's

11 fair, and I have a very serious issue with that,

12 particularly in light of the Court -- of the fact that this

13 Court issued an order in March which reflected the constant

14 changing of Plaintiffs and the constant changing of theories

15 and the constant changing of co-counsel, and the Court said

16 "No more."  We said, "Your Honor, okay, one more.  But

17 please no more after this."  And your Honor said "No more."

18 And here we are.  This case will be -- will be two years old

19 on November 3rd.  I don't think we should have to start back

20 at the beginning, and I feel very strongly about that, and I

21 need to say that.  I'm not going to be personal about this,

22 but the time is what it is, and we are where we are, and the

23 discovery has been where it's been.

24      With respect to the merits and what Mr. Cutter had to

25 say about the merits, he said the product at issue is the

24

1  service plan, and I absolutely agree with that, and I think

2  that's very important, particularly when we get to the

3  question of whether the Plaintiffs have come forward with a

4  model that shows or can come forward with a model that shows

5  class wide injury, and that's a gating question.  It's not a

6  we decide liability and this doesn't matter.  It's a gating

7  question.  And as to that gating issue, the issue of whether

8  -- and I think your Honor had it exactly right -- the issue

9  of whether the class paid a price premium, because that's

10 the question, for a plan that said new or equivalent to new

11 in performance and reliability, which I submit, your Honor,

12 means not always new.  You know, I want to bring this case

13 back to the real world, and I think your Honor recognizes

14 that that's where we operate.

15      Doctor Pak (phonetic), with all due respect, doesn't

16 operate in the real world.  He has an extreme theory.  If

17 you say to a consumer "You're going to get a phone that's

18 new or equivalent to new in reliability and performance,"

19 the consumer hears -- at best, consumers will hear different

20 things, but I think a whole lot of those consumers are going

21 to hear "I might get a new phone.  I might not get a new

22 phone."  In terms of the phone that was -- was high quality,

23 equivalent to new in performance and reliability, although I

24 don't think this is a -- a question on which class

25 certification turns, I do think it's important that I not

1  stand up here and have my clients' phones called used or

2  lemon phones or that kind of really disrespectful, and I

3  know the counsel's new to the case, but Apple expends

4  extraordinary resources on its remanufacturing phones.  It

5  doesn't send a few parts over to -- to China and get them

6  back, and I'm trying to be careful in terms of what's under

7  seal, but Apple tests those parts before the -- the -- the

8  remanufacturing process is identical to the remanufacturing

9  process for a new phone.  It's on the same line which is

10  converted.  Sometimes it results in a service --

11          THE COURT:  Are you arguing the merits to me now,

12  Ms. Preovolos, or is there something related to the class

13  certification motion in there?

14          MS. PREOVOLOS:  I appreciate -- what I'm -- what

15  I'm arguing is I don't think it's fair, and I don't think

16  there's any evidence in the record to let anybody say lemon

17  phone here.

18          THE COURT:  Okay.  All right.  So let's go to the

19  class certification motion.

20          MS. PREOVOLOS:  Well, the point that's important

21  for class certification, though, is new or equivalent to new

22  in performance and reliability.  I don't -- so I haven't

23  heard any evidence except Doctor Pak's theory that any

24  member of this class would understand that term in a uniform

25  way to mean anything other than a phone that wasn't new, and

1  I think that's very important.  Okay.  And if Doctor Pak has

2  a scientific theory, an academic theory -- and I don't take

3  issue with it as an academic theory, okay, but in the real

4  world, in the world where manufacturers supply phones and

5  service plans are sold, in the real world there has been no

6  evidence brought before this Court that Apple's

7  remanufactured phones aren't equivalent to new.  Nobody has

8  pointed to a defect for them.  We've had two years of

9  discovery.  The Plaintiffs haven't requested the phones.

10 They haven't examined the phones.  Doctor Pak hasn't tested

11 the phones, and I do think the Court is permitted to go to

12 the merits, you know, sufficient -- so here's the merits

13 issue that the Court does have to look at, right, is there a

14 uniform misrepresentation, would there be a common

15 understanding and common reliance, and your Honor already

16 answered that question.

17      Ms. English never heard the phrase "equivalent to new

18 in performance and reliability."  She never heard it.  She

19 didn't rely on it.  She didn't read on it.  She didn't read

20 it, and the one thing the Ninth Circuit's cases couldn't be

21 more clear about is that the named Plaintiff has to rely,

22 and Mr. Cutter says, well, she relied on a -- on an oral

23 statement "new," but -- but that is -- is exactly what your

24 Honor found wasn't uniform, and you're right about that,

25 and, in fact, it's -- it's undisputed at the time -- at the

1  point most people bought their service plans, which is not

2  when they bought their phones, there was no representation

3  at all about the nature of the replacement unit.  It wasn't

4  part of a conversation.

5      So there's no uniform misrepresentation.  There's no

6  reliance, and there's no evidence in the record that (a)

7  people would have understood new or equivalent to new to

8  mean anything other than refurbished or, indeed, that they

9  would have had any common understanding, and I think what's

10 very important is that Ms. English was asked at her

11 deposition, you know, "Did you consider the term new or

12 equivalent to new?"  "No."  "Do you have an understanding of

13 the term "New or equivalent to new in performance and

14 reliability?"  No, she didn't.  She said she didn't have an

15 understanding of that term.  So I think Plaintiffs would

16 have an awfully steep hill to climb, as you put it, to show

17 that notwithstanding the fact that the named Plaintiff

18 didn't have an understanding of that phrase, millions of

19 people would have understood it in the academic way Doctor

20 Pak suggests and in the extreme way Doctor Pak suggests.  I

21 mean, Doctor Pak says even a new phone isn't really new.

22 It's not quite new.  You know, and we now know, if you take

23 our representation and our -- our evidence for the moment

24 that Ms. English's phone was new, she had issues with that

25 phone.  She didn't bring it to Apple, but she said she had

1 freezing problems with that phone.

2     And that's exactly Doctor Lawl's (phonetic) point, all

3 devices exist along a continuum of reliability, new devices,

4 refurbished devices, and so in the real world, the notion

5 that people -- that there was a -- that there was a common

6 misrepresentation here just doesn't fly, and you have to

7 look, as your Honor has.  And with the named Plaintiffs --

8 and the named Plaintiff didn't have an understanding, and,

9 as your Honor points out, you know, there's no such thing as

10 vicarious oral misrepresentations, and the oral

11 misrepresentation standard in this Circuit is very high.

12 And the Dufore (phonetic) case collects the cases, and it

13 says, you know, there's sort of loose language in some cases

14 like First Alliance that, you know, there's a broader or a

15 looser standard, but when you actually look at the cases,

16 they all involve a memorized or very standardized pitch or

17 representation.

18     And if you look at the sales person testimony here,

19 what you learn is, one, most of the time when the service

20 plan was purchased, it wasn't even talked about because

21 wanted to know, "Do I get a replacement if I drop my phone?

22 How much will it cost?  How long is the coverage?"  The

23 nature of the unit wasn't a focus of the conversation, but

24 when asked, the testimony of the sales people make clear

25 that it was very very variable, and to say, you know, that

1  Ms. English heard new and thought, you know, like new or

2  equivalent to new in performance and reliability meant the

3  same thing, she was asked that at her deposition, and that's

4  not what she said.  You know, that's counsel's creation.

5       With respect to scienter or the notion that Apple hid

6  the fact that the phone might be refurbished, again, new or

7  equivalent to knew in performance and reliability means

8  remanufactured, not new.  The terms and conditions that Ms.

9  English signed at the time her phone was repaired, I think

10 it's important to note this is all one transaction.  So Ms.

11 English's son breaks the phone.  Ms. English walks into the

12 store  She gets a -- a repair or service event, which is the

13 replacement -- the out of warranty replacement.  She buys

14 the Apple Care Plan.  It all happens at once.  And she walks

15 out of the store -- she signs that receipt at the time she's

16 handed the phone, and it says "refurbished."  I can't,

17 because I wasn't there, you know, swear to, you know, the

18 instance in time, but before she left the store, she signed

19 a device that -- she signed a disclosure that said

20 refurbished.  Why did Apple use refurbished on the repair

21 terms and not use refurbished in the terms and conditions?

22 Your Honor, I honestly don't know, and I've tried to find

23 out.  My guess is they were written by different people with

24 different mind-sets.  But -- but -- and I think there is

25 certainly a view at Apple that Apple's -- and I'm not trying

30

1  to get into the merits.  I'm trying to tell you where this

2  comes from, okay.

3         THE COURT:  I'm really struggling to -- with your

4  argument because it does seem so -- you're so wrapped up

5  with the -- why Apple's right, that I'm not --

6         MS. PREOVOLOS:  Well, no.

7         THE COURT:  -- that I'm having trouble with the,

8  you know, commonality, typicality, adequacy, those things.

9         MS. PREOVOLOS:  That's the whole point.  There was

10 no common understanding of these terms.  There wasn't even

11 common exposure to them, right.  I mean, that's what your

12 Honor said, and that's right.  But the -- the point -- so

13 the point about refurbished, though, is if Apple -- it

14 doesn't -- so I don't think it's going to the merits to talk

15 about what people knew and what people were told and what

16 the common understanding might be, okay.  And -- and if

17 Apple had documents out in the world saying refurbished,

18 refurbished, refurbished, was that really omitted or

19 concealed seriously?  I mean, can that seriously be argued

20 here?  I don't think so.  Refurbished was out there.

21        THE COURT:  What about damages, if you would?

22        MS. PREOVOLOS:  Okay.  And that was almost the

23 place that I went first because Mr. Cutter says the measure

24 of damages is the difference in value between the plan as

25 represented and the plan as received, right.  The plan as

1  represented -- and I do have to come back to the plan said
2  new or equivalent to new.  It did not say brand new, and I'm
3  not going to argue the merits, but that was the statement,
4  and how people understood it matters, but in terms of
5  damages, I think what's important is that neither, what --
6  neither Doctor Almond nor Mr. Tragulus come anywhere close
7  to addressing the question your Honor has asked.
8       So did they do a consumer survey or did they design a
9  consumer survey to get at how people would have understood
10 those terms and whether they would have seen a difference in
11 the plans?  No, they didn't.  Critically, we know that Ms.
12 English bought another service plan.  She bought the Best
13 Buy Geek Squad plan, and that plan actually cost more.  It
14 said refurbished all over it, and it cost more.  It cost
15 more to buy it.  It cost $278, and it cost more to get an
16 accidental damage incident, and it only provided one
17 incident, and -- and, you know, so in the but for world, I'm
18 not convinced -- not only am I not convinced, the only
19 evidence we have is that there was no price premium, and my
20 speculation -- and, you know, beat me if it's the merits,
21 but my speculation is it's because Apple's plan said new or
22 functionally equivalent to new.  The Geek Squad plan said
23 refurbished, and the consumers weren't drawing a dime of
24 difference, and -- and Doctor Almond says "I don't have to
25 do a consumer survey.  That's not the point."  He says "I

1  don't have to look at -- at other service plans."  And Mr.

2  Tragulus says, "Nothing more here.  That's not what I would

3  do."  And I'm sorry, your Honor.  Really?  Are we going to

4  start now with damages experts after class cert?  Because

5  the Plaintiffs are supposed to come in at class cert and

6  prove up a damages model that can trace injury from their

7  theory of harm to the class and not other harm, and I just

8  think you can't do that here for a bunch of reasons.  Number

9  one, I still submit Plaintiff didn't read or rely on the

10  core representation the Plaintiffs are relying on.  She said

11  when asked that she didn't have a particular understanding

12  of it.

13      I submit that if Plaintiffs had done a consumer survey

14  -- and this does matter for uniformity, right?  If the

15  Plaintiffs had done a consumer survey, you wouldn't find a

16  common interpretation of that term or a common consumer

17  understanding of that term, and, yes, you can presume class-

18  wide reliance where the named Plaintiff relied, right, and -

19  - and where there was uniform exposure.

20      We don't have either of those things here, and we don't

21  have a damages model that works, you know.  Doctor Almond's

22  model was riddled with errors and problems, and -- and it

23  doesn't measure what the Court, I think, correctly suggests

24  it has to measure, and I'm not convinced you can measure

25  that, and the evidence we've seen is that if you do measure

1  that, you'll conclude there was no damage, there was no

2  price premium.

3       And so I think there are huge problems, and I just

4  don't think it's fair to my client for counsel t say let's

5  just start over, you know.  And Tragulus, by the way,

6  doesn't solve our problem because Tragulus talks about how

7  you measure damages, and I do think this is important.

8  Tragulus doesn't talk about restitution, doesn't talk about

9  the test your Honor uses, doesn't talk about the test in

10 Google Ads, doesn't talk about the (indiscernible) test.  He

11 says "I'm an expert, and I cite all these authorities about

12 how you calculate future profits in a business case, how --

13 how you calculate" -- he cites all those authorities about

14 how to calculate lost future profits in a business case.  He

15 has not said we can figure out the price premium here, and I

16 think it's -- that was supposed to be done now, you know.

17 He didn't have to complete his class-wide model, but, you

18 know, as Judge Koh said in <u>Mordiba</u> (phonetic), you know,

19 this court is not a rubber stamp.  You can't just stand up

20 and say we have a damages model and, you know, it's a

21 damages model and so what if it doesn't work or we'll fix

22 all the problems later.  You know, that's just not right,

23 particularly where we have a service plan here, and -- a

24 competing service plan which -- which, by the way, also

25 torpedoes the core reliance theories in this case because

1  Ms. English says "I wouldn't have bought the Apple plan, and

2  I wouldn't have paid as much for it if I knew that I might

3  get a not new phone."  And then she says "I really like the

4  Best Buy plan.  They disclosed that I got refurbished

5  phones.  I always got refurbished phones.  They had exactly

6  the same freezing problem as the Apple phones, and, by the

7  way, it costs more."  I just -- where's the commonality?

8  Where's the reliance?  Where's the injury?  Where's the

9  credibility of materiality?

10      So I think this case has very serious problems.  I

11  think Plaintiffs have had multiple times chances to fix

12  them.  Your Honor permitted a reply expert to come in, a

13  brand new expert, and he didn't even address the proper

14  measure of damages here.  He didn't try.  And I don't think

15  at the end of the day the problems are cured because

16  functionally equivalent to new in performance and

17  reliability is not going to -- it is not false on its face.

18  It's only false if you listen to Mr. Tragulus, right.  And

19  so that means you have to look at how consumers would

20  understand it, and we don't have any evidence here that

21  consumers would understand it in a uniform way that makes it

22  deceptive, and we know that Ms. English had no particular

23  understanding of it at all.  So that's one big problem.

24      There are no uniform oral representations under the

25  case law in this Circuit.  We all know that.  I think that's

35

1  clear.  The named Plaintiff didn't rely.  She went out and

2  bought a plan that had the defect she claims this plan had,

3  and she paid more for it.  So I don't think there was a

4  price premium in the marketplace.  So -- so I just think

5  this case fails.  There's just no predominance in all kinds

6  of different places.

7           THE COURT:  Mr. Cutter, I'll give you just a few

8  minutes if you'd like to respond, but I think we're -- we've

9  exposed most of these issues.

10           MR. CUTTER:  Yeah, and I think there are a few

11 important points.  First of all, this is as clear a script

12 case as there is.  There's a single core phrase that

13 predominates everywhere.  It's in the terms and conditions.

14 It's in Apple Care Plus.  It's the only phrase that is

15 consistently referred to in training, and it's the phrase

16 that Ben Bund, that Tara Ford, that all the Apple employee

17 witnesses testified they used.  They said new or like new.

18 They said new or equivalent to new in performance and

19 reliability.  So that's the core phrase, and we don't need

20 vicarious reliance to say it.  It's there.  It's written.

21 It permeates everything that Apple does, and it's the only

22 phrase that they ever taught people to use, and they were

23 very careful and deliberate about it.  So I feel very

24 comfortable with that line of cases.

25     As to the nature of the phrase and its falsity, you

1  know, plenty of cases say that's merits, but I think we've
2  put more than enough evidence before the Court to show that
3  it's a -- it's a false statement.  I'll just leave it at
4  that.  Doctor Pak is preeminent.  I'm confident that if and
5  when he testifies before this Court, you'll find him
6  persuasive and dispositive on that issue.

7      As to -- and just comparing it to cases that have been
8  certified, you know, read through the analysis in Kashi,
9  read through the analysis in Blue Diamond of "all natural."
10 To me this phrase is every bit as misleading and every bit
11 one that -- and the analysis in Cole.  Those are all very
12 much in the same vein as this case, and Ms. English in terms
13 of commonality, she's the -- she's the person who's told
14 you'd get new phones.  That's a piece of the statement
15 that's false.  The cases are clear that you don't need to
16 have been told every piece of the representation to
17 establish reliance.  That's Cole that discusses that very
18 clearly in terms of the brochure that was partially read to
19 the Plaintiff in that case.

20     So I think we're on very solid ground in terms of
21 representations and the reliance.  The damages argument that
22 you just heard was incomplete at best.  Mr. Tragulus said
23 clearly that consumer surveys could and should be used to
24 establish the differential in this case, and their expert --
25 Cox I believe his name is -- testified that consumer surveys

1 were an adequate and recognized way of establishing a

2 damages model like this, and so we have agreement among the

3 economists that you can establish a damages model using a

4 consumer survey, which is exactly what we're going to do in

5 this case.  We were required to do the consumer survey

6 before class certification?  No.  I think what we're

7 required to do is establish that there is a plausible

8 manageable way in which damages can be googled, and I think

9 we've established that, and -- oh, the other point I wanted

10 to make is this red herring about the Geek Squad plan.  She

11 opted for a plan with a monthly payment.  You know, we all

12 know how these finance companies get you.  In the long run

13 you pay more for a monthly payment.  It has some superficial

14 appeal up front.  You're paying $10 or $15 a month.  In the

15 long run she ended up paying more, but it's in no way any

16 kind of evidence that undercuts our damages theory in this

17 case.

18           THE COURT:  All right.  Thank you both.  It will

19 take me a little bit to -- to generate an order on this, and

20 in that order I will undoubtedly include what the next steps

21 are.  So --

22           MR. CUTTER:  Thank you, your Honor.

23           THE COURT:  -- which may be nothing, may be

24 everything.  You never know.

25           MR. CUTTER:  Thank you, your Honor.

38

1          THE COURT:  Okay.  Thank you.

2     (Proceedings adjourned at 4:05 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

39

<u>CERTIFICATE OF TRANSCRIBER</u>

1

2

3      I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9      I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16          Echo Reporting, Inc., Transcriber

17          Thursday, February 11, 2016

18

19

20

21

22

23

24

25